# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs March 28, 2012

## STATE OF TENNESSEE v. DANIEL G. HAMPTON

**Appeal from the Circuit Court for Rhea County**
**No. 16926      Buddy D. Perry, Judge**

---

**No. E2011-01836-CCA-R3-CD - Filed September 17, 2012**

---

After the Rhea County grand jury indicted the Defendant-Appellant, Daniel G. Hampton, for one count of first degree premeditated murder, Hampton entered an <u>Alford</u> plea, <u>see</u> <u>North Carolina v. Alford</u>, 400 U.S. 25, 37 (1970), to second degree murder, a Class A felony. The trial court accepted the parties' agreed sentence of fifteen years in the Department of Correction and, after a sentencing hearing, ordered that the sentence be served consecutively to Hampton's unserved federal sentences. The sole issue presented for our review is whether the trial court erred in ordering a consecutive sentence. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

B. Jeffery Harmon, District Public Defender (on appeal and at trial); Mechelle Story, Assistant District Public Defender (at trial), Jasper, Tennessee, for the Defendant-Appellant, Daniel G. Hampton.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; James Michael Taylor,  District Attorney General and James W. Pope, III, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Facts.** At the plea submission hearing on April 27, 2011, the State summarized the facts in Hampton's case:

[T]he proof in this case would show that in August of 2007, [Hampton] and his wife Dorothy Faye Hampton were living in . . . Rhea County . . . .

[A]ccording to Mr. Hampton's statement that he gave, the marriage had gotten somewhat rocky. They had . . . some problems. There were three small children. One was three years old at the time, one was two, and one was only nine months old. Suffice to say, at one time, according to Mr. Hampton's statement, he had even filed for divorce, but to bring it up to the evening of August 17th, early morning of August 18th, they were at the house. They had been to Knoxville, and by Mr. Hampton's statement, they had both partaken of some drugs.

Early in the morning, according to Mr. Hampton, his wife had roused him from sleep, and his statement was basically to the effect that she was in a depressed and suicidal mood, and had obtained, or had with her a pistol. He contended that they got in a struggle over the gun. He was trying to get it away from her, and in the process the gun discharged and killed her. He then at some point in time called 911 and told them what had happened, and then waited for the police and an ambulance to arrive.

The state's proof in contradiction of Mr. Hampton's depiction of the wound, would primarily consist of Dr. Darinka Mileusnic's, who is a forensic pathologist, testimony that Mrs. Hampton's injury was what is called a tight contact gun wound, and it was four inches below the crown of her head, almost to the midline, and that the evidence of the muzzle being pressed to the back of her head when the fatal shot was fired, and that is not consistent with the depiction of the incident by Mr. Hampton.

Hampton added to the State's summary the fact that when he called 911, the dispatcher informed him how to perform CPR, which he attempted unsuccessfully. After accepting Hampton's Alford plea and the agreed sentence of fifteen years, the trial court scheduled a sentencing hearing to determine whether Hampton's sentence should be served concurrently or consecutively to his federal sentences.

**Sentencing Hearing.** At the June 10, 2011 hearing, Chris Mynatt, a detective with the Roane County Sheriff's Office and a task force officer assigned to work with the Federal Bureau of Investigation in Knoxville, testified that he had worked as a law enforcement officer in Roane County for approximately fifteen years. Hampton previously lived in Roane County before moving to Rhea County, and Detective Mynatt first became aware of Hampton's involvement in the drug trade in 1999. When Detective Mynatt later began

-2-

working drug cases exclusively, he learned the full extent of Hampton's drug trafficking. Detective Mynatt testified that Hampton was the "biggest" drug dealer in Roane County:

> It was constant business at his place everyday. . . . One person right after another, almost a [twenty-four-hour-a-day] period. . . . [I]t . . . wasn't uncommon for people, even informants that we attempted to send in to make purchases, to say they were going to have to wait in line for sometimes up to an hour just to get to the point where they were able to purchase, because of all the other people that were there to purchase.

Hampton would sell drugs out of a trailer residence he owned and used solely for that purpose, and he attempted to avoid detection by surrounding his operations with countersurveillance technology such as frequency detectors, metal detectors, and police scanners. Hampton refused to sell drugs to potential purchasers who could not pass such screening.

Detective Mynatt testified that around 2000 or 2001, law enforcement officers attempted to build a case against Hampton by sending a confidential informant to buy drugs from Hampton. After Hampton was indicted based on the confidential informant's purchase, Hampton attacked the informant. The informant thereafter refused to cooperate with the prosecution, and the case was dropped. Hampton foiled other attempts at prosecution through similar violent tactics. Law enforcement officers initiated a federal wiretap investigation "because [they] didn't have any other means in order to go after [Hampton] with traditional means." As a result of the wiretap investigation, which ended shortly before Hampton killed the victim, Hampton pleaded guilty in federal court to conspiracy to distribute and to possess with the intent to distribute cocaine hydrochloride, cocaine base, marijuana, and Oxycontin. He also pleaded guilty to possession of a firearm in furtherance of drug trafficking, and he received a total effective sentence of twenty-five years' imprisonment. Hampton was one of six codefendants charged in the federal prosecution, and Detective Mynatt testified that Hampton was the "ringleader" of the conspiracy. Hampton also stipulated in the federal case that he was a member of the Outlaw motorcycle gang.

During the course of the federal investigation, officers discovered that although Hampton's only legitimate source of income was a disability payment in the amount of $541 per month, he paid monthly expenses of two to three thousand dollars. Hampton owned two houses in Rhea County, two trailer residences in Roane County, multiple cars and trucks, and multiple Harley-Davidson motorcycles and all-terrain vehicles. Detective Mynatt testified that Hampton stipulated in federal court that he paid for his residences and vehicles with the proceeds of illegal drug sales, and all of Hampton's real estate and vehicles were seized as

a result. Detective Mynatt further added that he never knew Hampton to hold lawful employment.

Detective Mynatt described one call the law enforcement officers heard in which Hampton ordered an attack on an informant in retaliation for the informant's cooperation with police. The informant was in jail, and Hampton ordered that he be attacked and his arms be broken. Hampton offered to pay the bond of the attacker in exchange. Although the listening officers attempted to contact the jail to prevent the attack, it had already begun.

On cross-examination, Detective Mynatt acknowledged that, other than the federal convictions, Hampton's only drug-related convictions were one misdemeanor marijuana conviction from 1997 and one Class E felony marijuana conviction from 1996. Detective Mynatt explained that the lack of additional drug convictions "was due to the elaborate and fairly sophisticated efforts that [Hampton] took to avoid detection."

Carmelia Jeffers, the victim's mother, testified that the victim was twenty-four years old at the time of her death. The victim and Hampton eloped when the victim was eighteen years old and in high school. The two had three children together, ranging in age from less than a year old to five years old. The victim also cared for Hampton's young daughter by another relationship. All these children were present at the time of the victim's murder. Ms. Jeffers never knew Hampton to have a job, and she knew that he was involved in the drug business for the duration of her daughter's relationship with him.

Ms. Jeffers testified that she saw Hampton commit acts of domestic violence against the victim and that the victim often had bruises and other injuries as a result. Ms. Jeffers also heard Hampton threaten to kill the victim. Hampton would sometimes shave the victim's head as a form of punishment. Additionally, when Hampton left the victim and the children at home, he would padlock them inside so that they could not leave the residence. Occasionally, the victim would leave Hampton and go to domestic violence shelters, but she would always return to live with Hampton.

On cross-examination, Ms. Jeffers acknowledged that she used marijuana and was addicted to crack cocaine at the time of the victim's death and earlier. She also testified that Hampton had filed for divorce shortly before the victim's murder.

A presentence investigation report was admitted as an exhibit to the hearing. In addition to the information supplied by the witnesses' testimony, the report summarized Hampton's criminal record. He had been convicted of a federal drug conspiracy offense, a federal firearms offense, felony possession of more than half an ounce of a Schedule VI controlled substance, unlawful possession of a handgun, simple possession of marijuana,

evading arrest, speeding, reckless driving, vandalism, and six convictions for reckless endangerment. Regarding Hampton's education, the report indicated that he dropped out of high school after the tenth grade and later earned his general equivalency diploma.

At the conclusion of the sentencing hearing testimony, Hampton stated in allocution that he never wanted the victim dead and that her death changed his life. He stated that since he was in prison, he was trying to live a better life by working and enrolling in school.

Following the proof at the hearing, the trial court determined that Hampton's sentence should be served consecutively to his federal sentences. This timely appeal followed.

**ANALYSIS**

Hampton argues that the trial court erred in sentencing him to consecutive sentences. He first argues that the trial court mistakenly determined that it lacked discretion to sentence him to concurrent sentences under the facts of this case. He also asserts, contrary to the trial court's findings, that he is not a dangerous offender and that he does not have an extensive record of criminal activity such that the trial court could require him to serve the sentences consecutively. The State does not address the alleged error regarding the trial court's discretion to impose a concurrent sentence. It responds only that the trial court correctly found that the statutory factors supported consecutive sentencing.

We first consider Hampton's claim that the trial court erroneously concluded that it lacked discretion to impose a concurrent sentence. This issue is a question of law, which we review de novo. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citing State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997)).

Where a defendant is convicted of one or more offenses, the trial court generally has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a), (b) (2010); Sentencing Comm'n Cmts, T.C.A. § 40-35-115(d) ("[W]hile consecutive sentences are discretionary, in a few instances, consecutive sentences are mandated either by statute or by Tenn. R. Crim. P. 32."). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). Furthermore, an order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense," T.C.A. § 40-35-102(1), and the length of a consecutive sentence must be "no greater than that deserved for the offense committed," T.C.A. § 40-35-103(2). Finally, as relevant here, Tennessee Rule of Criminal Procedure 32(c)(2)(B) states:

> If, as the result of conviction in another state or in federal court, the defendant has any additional sentence or portion thereof to serve, the court shall impose a sentence that is consecutive to any such unserved sentence unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders.

Tenn. R. Crim. P. 32(c)(2)(B).

Here, during argument following the evidence at the sentencing hearing, the trial court queried the parties regarding whether it had discretion to impose a concurrent sentence:

The issue for me . . . is not for me to look at the sentence and say I think he has enough time, that's adequate. The issue for me is to look at 40-35-115 and to determine whether that statute is applicable or not, and if the facts support the applicability of that statute, my personal thoughts on what his sentence should be are not particularly relevant. . . . Assume, arguendo[,] that the facts justify an unavoidable conclusion that one or more of those subsections are applicable. If that occurs, then at that point I have no option. I can't say I think the facts are applicable, I think this particular subsection is applicable, but I don't like the result, therefore I'm not going to do that. That's not my option, is it?

Both the State and the defense answered that the court could exercise its discretion to impose concurrent sentences despite finding that the categories under section 40-35-115(b) were applicable. The trial court restated its question, this time rhetorically: "I can't imagine . . . that a judge finding facts to support three separate sub offenses of 40-35-115, if you found those facts to be applicable, and you found the statute to be applicable, how would a judge not apply the law in that case?" The court then incorporated into its findings the State's argument on the propriety of consecutive sentencing and determined that Hampton was a professional criminal under subsection (b)(1), that Hampton had an extensive record of criminal activity under subsection (b)(2), and that Hampton was a dangerous offender under subsection (b)(4). The court continued, determining that consecutive sentencing was mandatory:

[M]aybe counsel is correct that I could say they're applicable, but I don't like it, and I'm not going to use this particular statute to make the sentences consecutive. I find that it is appropriate in this case for me to apply them, so it's not a question of me not finding that they should be applied, but I'm also making a finding that I don't really think I have an option, once I make a determination that there is a factual basis for as many as three of those factors to be applicable to the case, so my judgment is that it is to be a consecutive sentence.

We conclude that the court erred in determining that it had no discretion to order a concurrent sentence. Section 40-35-115 is explicit that, absent specific circumstances that are inapplicable here, the decision to impose a consecutive sentence is within the court's discretion. T.C.A. § 40-35-115(b) ("The court <u>may</u> order sentences to run consecutively if the court finds by a preponderance of the evidence that" one of seven factual circumstances applies.) (emphasis added). Tennessee Rule of Criminal Procedure 32(c)(2)(B) is similarly clear that such a decision in the context of cases like Hampton's is a discretionary matter. Tenn. R. Crim. P. 32(c)(2)(B) (requiring consecutive sentencing when a defendant has an

unserved federal sentence "unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently") (emphasis added). Despite this error, we nevertheless conclude that the record supports consecutive sentencing. See State v. William Jeffrey Sweet, No. E2008-00100-CCA-R3-CD, 2009 WL 2167785, at *23 (Tenn. Crim. App. July 21, 2009) (upholding an order of consecutive sentencing because the record established a statutory basis for consecutive sentencing, even though the trial court erroneously relied on the fact that the case involved more than one victim in imposing the consecutive sentence); State v. Nathaniel Shelbourne, Jr., No. M2007-01844-CCA-R3-CD, 2008 WL 4644186, at *6 (Tenn. Crim. App. Oct. 21, 2008) (upholding an order of consecutive sentencing when this court was able to make findings pursuant to Wilkerson based on the record despite the fact that the trial court failed to relate the Wilkerson requirements to the defendant on the record before sentencing him to consecutive sentences as a dangerous offender), perm. app. denied (Tenn. Mar. 16, 2009)) .

Here, the court determined that Hampton was a professional criminal, was an offender whose record of criminal activity was extensive, and was a dangerous offender. T.C.A. § 40-35-115(b)(1), (2), (4). Although Hampton argues that the trial court erred in determining that he was a dangerous offender and that he had an extensive record of criminal activity, we conclude that the trial court properly applied all three of the aforementioned factors before ordering that Hampton's sentence be served consecutively to his federal sentences.

Hampton does not argue that the trial court erred in determining he was a professional criminal pursuant to Tennessee Code Annotated section 40-35-115(b)(1). The record shows that Hampton had significant assets consisting of land, homes, vehicles, motorcycles, and all-terrain vehicles. These assets were seized by federal agents because Hampton purchased them with funds from his drug business. Hampton had no employment history, was receiving only $480.00 per month in social security disability funds, and had been dealing drugs for several years. The record contains overwhelming evidence that Hampton was a professional criminal, and the trial court properly applied this factor.

We also conclude that the trial court properly determined that Hampton's record of criminal activity was extensive. See id. § 40-35-115(b)(2). From the age of twenty-one to thirty-three, Hampton was convicted of three felonies and twelve misdemeanors. Three of his convictions were related to drugs, two of his convictions were related to possessing a firearm, and six of his convictions were related to violence. This court has held that "[e]xtensive criminal history alone will support consecutive sentencing." State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (citing State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994)). The trial court properly applied this factor.

Finally, we conclude that the trial court properly found that Hampton was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). Regarding this subsection, the Tennessee Supreme Court has stated:

> Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. <u>The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.</u>

State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995) (emphasis added). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" factor because it is "the most subjective and hardest to apply." Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999))

Here, the trial court specifically adopted the State's arguments regarding the "dangerous offender" factor and incorporated them into his factual findings. Because the State specifically applied the additional factual findings required by Wilkerson, we conclude that the trial court did, in fact, determine that consecutive sentencing was reasonably related to the severity of Hampton's offense and the need to protect the public from Hampton's future criminal acts. Accordingly, we conclude that the trial court properly ordered Hampton to serve his sentence in this case consecutively to his federal sentences.

## CONCLUSION

Upon review, we affirm the trial court's judgment imposing consecutive sentencing.

_____
CAMILLE R. McMULLEN, JUDGE